**Opinion issued July 30, 2015**



In The

# Court of Appeals

For The

# First District of Texas

—————————————

## NO. 01-13-00619-CV

—————————————

**LEE ANN WHEELBARGER, TERRI TIEDEMANN,
DOREEN MARDERNESS, JERRY SAVOY, HOWARD JANSON,
CARL ALAN KIVELA, JAMES HUSEMAN, BULL CAPITAL COMPANY,
JAMES DURHAM, MARY LOU DURHAM, PATRICIA KOELLING, AND
FRANK GENZER, JR., Appellants/Cross-Appellees**

**V.**

**THE LANDING COUNCIL OF CO-OWNERS, Appellee/Cross-Appellant**

**and**

**WILLIAM HENSLEE, TOM JENKINS, TROY JONES,
DAVID MARKS, BARNARD PEARL, THOMAS WALSH,
STAN WILLIAMS, ANDREW ROSENBERG, JACK EREIRA, AND
TIMOTHY PATAK, Appellees**

**On Appeal from the 190th Judicial District Court
Harris County, Texas
Trial Court Case No. 2010-58056**

**O P I N I O N**

After Hurricane Ike caused significant damage to their homes, a group of condominium owners sued their condominium association and members of its board. The plaintiff owners argued that by failing to repair hurricane damage to the condominium complex and by demolishing it, the association acted negligently, breached the association's declarations and bylaws, and violated the Texas Property Code. The trial court granted directed verdicts on the claims against the individual board members and denied requests for declaratory relief. After a trial on the remaining claims, a jury returned a verdict for the plaintiffs. Pursuant to the plaintiffs' election, the trial court entered judgment in their favor on their contract claims. The plaintiff owners now appeal the dismissal of their claims against the individual board members, while the association cross-appeals the judgment against it. Finding no error, we affirm.

**Background**

The Landing was a condominium complex in the City of El Lago, Texas. Built in 1969, it consisted of 17 buildings and approximately 156 condominium units. The Landing occupied approximately seven acres of waterfront property along Clear Lake, and it featured a marina. Many of the units at the Landing had boat slips.

The formative document for The Landing was a condominium declaration which provided that an association, the Landing Council of Co-Owners, would govern and control the affairs of the complex. The Council's responsibilities included decisions such as whether and how to make improvements or repairs to common areas and features, as well as any possible decision to terminate the condominium development and partition or sell the property. The membership of the Council consisted of all owners of condominium units in The Landing, although the affairs of the Council were directed or managed by a Board of Administrators consisting of seven members. The Council also was governed by a set of bylaws.

In September 2008, Hurricane Ike made landfall near Galveston Island, bringing high winds and flooding to the area, including the City of El Lago. The Landing sustained significant damage. Large quantities of debris washed or blew into the parking lot and marina, and multiple buildings suffered interior and exterior damage. Several buildings suffered some degree of structural damage. The storm also knocked out power throughout much of the area, including power lines to the complex. The Landing's electrical power had come in through a single, common line, and it proved impossible to restore power on a building-by-building basis. Power was never restored to the complex.

Because The Landing's buildings sat at a lower elevation than the city sewer lines, pumps were used to lift wastewater to the level of the sewer lines. Without power, the pumps could not function. But the water supply to The Landing remained active, so sewage began flowing back through the pumps and out into Clear Lake. To prevent this, the water was also turned off on the day after the storm. Because the power was never restored, water and sewer services to the Landing also were never restored.

In accordance with Article 12 of The Landing's declaration, the Council asked its property management committee to mail out notices of a meeting to discuss repairs to the complex. In the event that "any part of the condominium Property shall be damaged by casualty," Article 12 provided rules for determining "whether or not it shall be reconstructed or repaired . . . ." Those rules required the Board of the Council to call a meeting within 15 days of the casualty's occurrence by written notice, to be delivered either personally or by certified mail, return receipt requested. The meeting itself had to occur not less than 15 days nor more than 40 days after the casualty. At the meeting, the Council members would vote to determine whether the "required construction [to repair or rebuild the property] comprises the whole or more than two-thirds (2/3) of the Condominium Project." If the Council voted that "reconstruction is required for the whole or more than 2/3 of the Condominium Project," then the Board was required to pay out all insurance

4

proceeds and the condominium development would be terminated, unless the co-owners unanimously agreed to reconstruct and repair all portions of the damaged property. If the Council voted that the damage comprised less than two-thirds of the property, then the Board was required to proceed with reconstruction and repair.

The property management company tasked by the Council with sending out notices of the Article 12 meeting failed to send them by certified mail, return receipt requested. Co-owners of the Landing reported to the Board that they had not received their notices. According to Tom Jenkins, a Board Administrator, the Board did not learn of the incorrect mailing until after the 15-day period for calling the meeting had expired. Meanwhile, the postal service returned approximately 40% of the notices as undeliverable. The Board then consulted an attorney and canceled the Article 12 meeting.

In July 2009, Richard Smith, the Building Official of the City of El Lago, determined that The Landing had "been damaged or destroyed to an extent of more than fifty-one (51) percent of its fair market value by the hurricane." As a result, under the City's zoning ordinance, The Landing could be repaired only if it were brought into compliance with the City's building codes.

The Board attempted to call another Article 12 meeting in October 2009, but a group of unit owners calling itself the "Concerned Owners of The Landing

Condominiums" objected on the grounds that the deadline for calling such a meeting had passed. The Concerned Owners ultimately obtained a declaratory judgment that the proposed meeting was untimely.

In March 2010, the Board convened a meeting under Article 10, whereby two-thirds of the owners could approve alterations or improvements to commonly-owned elements of the Landing. Failing such approval, only those owners consenting to the alterations or improvements would be obliged to pay for them. At the meeting, a majority of the Landing co-owners voted not to alter or improve the property.

After a hearing on April 26, 2010, the City determined that The Landing's buildings constituted substandard housing and a public nuisance. The Council was ordered to apply within 30 days for either a permit to repair the property or a permit to demolish it. If the Council elected to repair the property, it was to include "explicit details and assurances" that it would bring the property into compliance with existing codes. Some of the co-owners of The Landing sought to challenge that determination by appealing to Smith and to the mayor of the City of El Lago. The City responded that no order, decision, or other determination had been made from which an appeal could be taken; such an appeal would be possible only after The Landing sought a permit to repair or rebuild.

In late 2010, a fire caused further damage to the Landing. Four buildings were damaged directly by the fire. The Board called another meeting after the fire, this time under both Article 12 and Article 13, which governs termination of the condominium development. At the meeting, approximately 59.5% of the co-owners voted not to repair or reconstruct the property.

Ultimately, the Council obtained a demolition permit from the City of El Lago, and The Landing was demolished in April 2011.

In September 2010, several co-owners of The Landing—Bull Capital Company,[1] Carl Kivela, Ryan Meischen, Danford Meischen, Jerry Savoy, Howard Janson, Larry Thomas, Cheryl Thomas, and Terri Tiedemann—sued the Council and several current and former members of the Board in their individual capacities, namely: William Henslee, Tom Jenkins, Troy Jones, David Marks, Barnard Pearl, Thomas Walsh, Stan Williams, and Jack Ereira. During the course of the litigation, condominium owners Doreen Marderness, James Huseman, Patrick Koelling, and Frank Genzer, Jr., joined the suit as plaintiffs, and former Board Administrator Andrew Rosenberg was named as an additional defendant. The plaintiffs asserted claims for breach of fiduciary duty, negligence, breach of The Landing's

---

[1] The officers of Bull Capital Company, Mary Lou Durham and James Durham, also sued in their capacities as officers. However, the Durhams were not identified as plaintiffs in the live petition at the time of trial, and they did not request or recover any damages at trial.

7

declaration and bylaws, and gross negligence. They also sought to recover their attorney's fees.

Co-owner Lee Ann Wheelbarger also sued the named defendants, seeking declaratory relief for breach of fiduciary duty, negligence, gross negligence, tortious interference with contract, slander of title, damage to title, breach of contract, and conspiracy.[2] Although she also sought damages for these claims in her live pleading, she failed to produce evidence of those damages in response to discovery requests. The trial court therefore excluded evidence of her damages, and the jury was not asked to award Wheelbarger any damages. Finally, the plaintiffs sued Timothy Patak, a Board Administrator and former consultant to the Board, arguing that he aided and abetted the defendants' alleged breaches of fiduciary duty.

The trial court directed a verdict dismissing all claims against the individual defendants. A jury found that the Council breached The Landing's declarations and bylaws and breached fiduciary duties owed to all of the plaintiffs. The jury awarded damages to each plaintiff, excluding Wheelbarger and former plaintiffs Mary Lou and James Durham, about whom no damages questions were submitted.

---

[2] Wheelbarger also named as third-party defendants the City of El Lago and Richard Smith in his official capacity, but those claims were severed from the remainder of the case and dismissed for lack of jurisdiction. This court affirmed the dismissal. *Wheelbarger v. City of El Lago*, 454 S.W.3d 55, 60 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

The jury also awarded attorney's fees to each plaintiff, including Wheelbarger. The trial court entered judgment in favor of the plaintiffs, awarding the damages found by the jury. It found that the declaratory relief requested by Wheelbarger would affect the rights of all co-owners of The Landing, including those not party to the suit, and that her pleadings did not support all of the requested declaratory relief. The court therefore denied the requested relief. It also awarded the attorney's fees found by the jury, with the exception that it did not award any fees to Wheelbarger, who had obtained neither monetary nor equitable relief. Finally, the trial court awarded prejudgment and postjudgment interest, with the former running from November 20, 2012 until the date of judgment.

Wheelbarger, Tiedemann, Marderness, Savoy, Janson, Kivela, Huseman, Bull Capital, Koelling, and Genzer (collectively, Appellants[3]), raise three issues on

---

[3]    The Meischens and Thomases, although plaintiffs at trial, do not appeal. Although the Durhams filed a notice of appeal and are identified as appellants in the parties' briefs, they were not identified as plaintiffs in the live petition, the jury was not asked to award them damages, and they did not recover any relief at trial. Because they were not parties of record, they have no standing to appeal from the judgment. *See Gunn v. Cavanaugh*, 391 S.W.2d 723, 724 (Tex. 1965); *In re S.J.*, No. 14-11-00142-CV, 2011 WL 2150586, at *1 (Tex. App.—Houston [14th Dist.] June 2, 2011, no pet.) (mem. op.); *Cent. Mut. Ins. Co. v. Dunker*, 799 S.W.2d 334, 336 (Tex. App.—Houston [14th Dist.] 1990, writ denied); *see also* TEX. R. APP. P. 25.1(b) ("The filing of a notice of appeal by any party invokes the appellate court's jurisdiction."). Because standing is a component of subject-matter jurisdiction, we lack jurisdiction over the Durhams' attempt to appeal. *See M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex.

9

appeal. First, they argue that the trial court erred by directing a verdict as to claims against the individual board members. Second, they contend that the trial court used an incorrect date for calculation of prejudgment interest and should have used one of two earlier dates. Third, Wheelbarger argues that the trial court erred by dismissing her claims for declaratory relief and attorney's fees.

The Council cross-appeals and also raises three issues. First, it challenges the damages award as supported by insufficient evidence based on defects in the testimony of the plaintiffs' expert witness on damages. Second, the Council insists that the City had considered and rejected the evidence upon which plaintiffs rely to show that the Council had reason and a duty to challenge the City's substantial-damage determination; thus, legally insufficient evidence supports the jury's findings that the Council should have challenged that determination and that the failure to raise such a challenge damaged the plaintiffs. Third, the Council argues that no finding or cause of action supports the trial court's award of attorney's fees to the plaintiffs.

**Analysis**

When parties present multiple grounds for reversal of a judgment on appeal, we must first address those issues that would afford the appellant the greatest

2001); *Sosa v. Koshy*, 961 S.W.2d 420, 424 (Tex. App.—Houston [1st Dist.] 1997, writ denied).

relief. *CMH Homes, Inc. v. Daenen*, 15 S.W.3d 97, 99 (Tex. 2000); *Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). We therefore first consider whether the trial court improperly directed a verdict on Appellants' claims against the individual defendants, which would require a remand for trial on those claims. We then consider the Council's challenges to the sufficiency of the evidence regarding liability and damages. Finally, we turn to the parties' arguments on prejudgment interest, declaratory relief, and attorney's fees, each of which would result in lesser forms of relief if sustained.

## I.  Plaintiffs' appeal: Directed verdict on claims against individual Board Administrators

Appellants first argue that the trial court erred by granting a directed verdict at the close of their case-in-chief as to all claims against the individual defendants. They contend that sufficient evidence showed that the Board breached certain fiduciary and contractual duties and that the individual defendants were members of the Board at relevant times. They therefore conclude that the evidence would have supported a conclusion that the individual defendants violated their own duties as fiduciaries of the co-owners of The Landing.[4]

---

[4] Appellees argue that Wheelbarger has waived her arguments on this issue because no copy of her live pleading appears in the record. Wheelbarger concedes that no copy appears in the record as a standalone document. We note, however, that a copy does appear in the record as an attachment to the plaintiffs' post-verdict brief in support of their amended joint motion for entry of judgment. No party challenges this document as inauthentic. In

We review a directed verdict under the same standard as a no-evidence summary judgment. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003); *Miles v. Lee Anderson Co.*, 339 S.W.3d 738, 741 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Accordingly, we review the evidence in the light most favorable to the non-movant, disregarding all contrary evidence and inferences." *King Ranch*, 118 S.W.3d at 751. "A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Id.* (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Therefore, the trial court should not grant the motion if "there is any evidence of probative value to raise an issue of material fact on the question presented." *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 220 (Tex. 2011).

Fiduciary duties arise either from formal relationships that are recognized as fiduciary as a matter of law, or in some cases, from the existence of an informal,

---

light of our disposition overruling this issue, we need not determine whether the pleading's inclusion as an attachment to another document preserves this issue as to Wheelbarger. We therefore decline to hold that Wheelbarger has waived her first issue.

12

"confidential" relationship between the parties. *Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship between the plaintiff and defendant; (2) the defendant's breach of a fiduciary duty arising from that relationship; and (3) injury to the plaintiff, or benefit to the defendant, resulting from that breach. *Id*.

The individual defendants moved for a directed verdict on the grounds that the plaintiffs introduced evidence only as to actions taken by the Board that constituted negligence or breached a fiduciary or contractual duty, not those duties owed or breached by the individual defendants. On appeal, Appellants make six arguments that the directed verdict was improper. Three of these arguments focus on the evidence presented at trial, while the others address primarily legal arguments for imposing liability on the individual defendants. However, because Appellants fail to show what actions any individual took that gave rise to a cause of action, all of their arguments fail.

## A.     Lack of evidence of individual Board Administrators' wrongful actions

First, Appellants argue that they presented expert testimony from Charles Jacobus, a board-certified real estate attorney and expert in homeowner association law, regarding the duties owed by the Board to The Landing's owners and the Board's breaches of those duties. While Jacobus did offer such testimony, his testimony focused on the duties of the Board itself, not the duties of the Board's

13

members. He did not testify about any action taken by any of the individual defendants, in any capacity.

Second, Appellants argue that they presented sufficient evidence that the plaintiffs sustained damages due to the wrongful demolition of The Landing. They did not connect such damages to any individual's acts, nor do they do so on appeal. Rather, the damages flowed from the demolition of the property, which resulted from actions taken by the Board as a whole.

Third, Appellants argue that they presented legally sufficient evidence as to the membership of the Board at relevant times. In support, they point to 40 "examples of evidence in the record." These examples include various summaries of the evidence, such as "the oral testimony of Lee Ann Wheelbarger . . . that a demolition permit was submitted on May 26, 2010, with no attempt to appeal and no denial of any permit ever having been returned." Another is that "Williams, Patak and Jones accompanied [a building inspection company] during its inspection." Yet another is that "the City refused to recognize [plaintiffs'] attempt to appeal [the determination that The Landing was substantially damaged] on November 24, 2009 because no permit had been submitted and refused as of that date."

None of this evidence demonstrates that any particular individual took any action in violation of any particular duty. As Wheelbarger concedes in her reply

brief, these 40 facts do not bear "on the existence of a duty or breach of duty of the board members," but they prove, at most, the membership of the Board at various times. And as the defendants observed in argument on the motion for directed verdict, no witness ever mentioned Administrators Henslee or Walsh by name in testimony during Appellants' case-in-chief; the names of many other Board members were mentioned only in passing. While Appellants point to numerous actions of the Board and note repeatedly that no Board member appealed the substantial-damage determination or applied for a repair permit, they make no effort to show how any individual acted in a way that was legally improper. Instead, they attempt to impute actions of the entire Board to each Board member, individually, without showing, for example, which Board members voted to take a particular action. Indeed, a major theme of trial was the inability of co-owners to take actions as individuals with respect to repairing, rebuilding, or preventing the demolition of The Landing. At most, Appellants point to certain attitudes, predispositions, or knowledge that certain Board members purportedly held, not actions taken in breach of any particular duty.[5]

---

[5] In light of this reasoning, we need not address Appellants' arguments that the Charitable Immunity and Liability Act, Chapter 84 of the Civil Practice and Remedies Code, does not confer immunity on the Board members or that that individual Board members are liable under a "general standard of care." In the absence of evidence demonstrating the wrongful actions taken by individual Board members, the availability of immunity and the applicability of any particular standard of care are irrelevant.

**B.    Inapplicability of personal liability under Property Code Chapter 82**

Finally, Appellants contend that the Board members are subject to personal liability for their alleged breach of fiduciary duties based upon several sections of the Property Code. First, Section 82.103(a) provides: "All acts of [a condominium] association must be by and through the board unless otherwise provided by the declaration or bylaws or by law." TEX. PROP. CODE § 82.103(a). Further, "[e]ach officer or member of the board is liable as a fiduciary of the unit owners for the officer's or member's acts or omissions." *Id.* Finally, Section 82.161 provides: "If a declarant or any other person subject to this chapter violates this chapter, the declaration, or the bylaws, any person or class of persons adversely affected by the violation has a claim for appropriate relief." *Id.* § 82.161. These statutes do not support Appellants' position that the individual Board members are liable for the Board's actions. Rather, to apply these statutes requires that the individual Board member take some action for which liability may lie; Appellants failed to prove that any particular Board member took such an action.

Appellants rely on two cases to advance this theory of individual liability. In the first, *Harris v. Spires Council of Co-Owners*, 981 S.W.2d 892 (Tex. App.—Houston [1st Dist.] 1998, no pet.), this court held that an association did not breach a duty of ordinary care in recommending a former association employee to two co-owners seeking a housekeeper, even though that person had been fired on

16

suspicion of theft and later misappropriated the co-owners' funds. *Harris*, 981 S.W.2d at 894, 898. Appellants also rely on *Sassen v. Tanglegrove Townhouse Condominium Ass'n*, 877 S.W.2d 489 (Tex. App.—Texarkana 1994, writ denied), in which the court of appeals reinstated a jury verdict holding an association liable for breaching a fiduciary duty to the condominium owners. Neither *Harris* nor *Sassen*, however, involves allegations against the condominium board's members, individually, and neither supports Appellants' argument that all actions of the Board can be attributed to each Board member individually without proof of that member's own actions. These cases thus have no bearing on this appeal.

Appellants failed to demonstrate that any particular Board member took any action that constituted a tort or breach of fiduciary or contractual duty. They further failed to demonstrate that any particular Board member had any duty to act in a particular manner, independently of the rest of the Board, but failed to act accordingly. The individual defendants were therefore entitled to a directed verdict on the claims against them. We overrule Appellants' first issue.[6]

---

[6] Appellants' failure to present any evidence of actions taken by the individual defendants is dispositive of their claims against those individuals. We therefore do not reach the merits of Appellants' arguments regarding the nature of any duties owed by members of the Board, to whom such duties are owed, or the availability of relief against the individual defendants in their individual capacities.

## II. Council's cross-appeal: Evidence of feasibility of repairs

We next turn to the Council's second argument, that the evidence was legally insufficient to establish that it should have challenged the City's substantial-damage determination and that the failure to raise such a challenge damaged the plaintiffs. Specifically, it argues that the condominium owners' claims all hinge on the premise that The Landing could have been repaired and restored to pre-hurricane status but for the Council's failures and inactions. According to the Council, there is no evidence to support that theory, as the evidence that repairs were feasible—the evidence upon which any challenge to the City's determination would have been brought—was either rejected by the City or unavailable before the May 26, 2010 deadline for the application for a repair or demolition permit. Thus, the Council argues that there is no evidence that the Board could or should have appealed, that such an appeal would have been successful, or that the failure to act damaged the plaintiffs.

When a party challenges the legal sufficiency of the evidence supporting a judgment, the reviewing court must look at all of the evidence admitted and determine whether, after disregarding all evidence that a reasonable trier-of-fact could disregard, more than a scintilla of evidence supports the judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005). Evidence is legally insufficient if the record reveals the "complete absence of evidence of a vital fact";

if the only evidence supporting a judgment is incompetent, such that a court cannot consider it; if "the evidence does not rise above a scintilla [such that] . . . jurors would have to guess whether a vital fact exists"; or if the evidence "conclusively establishes the opposite of a vital fact." *Id.* at 811–14. In conducting a legal-sufficiency analysis, we review all of the evidence in the light most favorable to the verdict. *Id.* at 822.

We begin by noting that the jury did not make any explicit findings of the sort of which the Council complains. The jury charge did not ask whether the Council should have challenged the substantial-damage determination or whether the failure to mount such a challenge damaged the plaintiffs. Rather, to the extent the jury considered any such questions, it would have done so only in the process of answering questions actually presented in the jury charge. The question before us, then, is not whether sufficient evidence supports the hypothetical findings that the Council attacks, but whether the purported absence of evidence to support those findings undermines the verdict that the jury actually made and upon which the judgment relies. *See id.* at 827–28.

The plaintiffs elected breach of contract as their remedy. As such, they recovered damages only for the Council's breach of the bylaws and declarations. The plaintiffs presented evidence at trial that the Council breached its obligations under these documents in numerous ways, including by failing to timely call and

19

hold an Article 12 meeting, by failing to take actions to mitigate the damage caused by the hurricane and fire, by failing to pay out or use insurance proceeds in a timely manner, by ceasing to make and collect assessments, and by demolishing The Landing without a proper vote by the co-owners. The plaintiffs also presented evidence that The Landing could have been repaired, but its condition deteriorated with the passage of time while the buildings lacked power and running water. The jury could have found that the Council breached its obligations under the declarations and bylaws and damaged the plaintiffs in a number of ways; it was not limited to deciding upon the failure to appeal the substantial-damage determination. We hold that legally sufficient evidence supported the jury's findings regarding breach of contract and resulting damages. *See id.* at 811–14.

Because legally sufficient evidence supports the jury's breach-of-contract findings, we overrule the Council's second issue.

## III. Council's cross-appeal: Damages

The Council also argues that the damages awards must be overturned because (1) the plaintiffs' expert failed to account for the residual value of the land associated with The Landing, (2) the expert made and acknowledged an error in calculating damages attributable to plaintiff Genzer's unit, and (3) the award of damages allows for a double recovery, given that the plaintiffs have already received insurance proceeds.

20

The admission of expert testimony is governed by Rule of Evidence 702. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 554 (Tex. 1995). "Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation." *Cooper Tire & Rubber Co. v. Mendez*, 204 S.W.3d 797, 800 (Tex. 2006). Expert testimony is unreliable if it is no more than subjective belief or unsupported speculation. *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 599, 113 S. Ct. 2786, 2800 (1993)). Expert testimony is also unreliable if there is too great an analytical gap between the data the expert relies upon and the opinion offered. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998). In applying this reliability standard, the trial court determines whether the analysis used to reach the expert's conclusions is reliable. *Id.* at 728.

When a party challenges an expert opinion as unreliable and constituting no evidence, we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). "[A] no-evidence review encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Id.*

## A.     Method of calculating damages

The Council argues that plaintiffs' damages expert, David Dominy, failed to account for the value of the land upon which The Landing once stood and in which each plaintiff holds an undivided interest. Under Texas law, "condominium ownership is the merger of two estates in land into one: the fee simple ownership of an apartment or unit in a condominium project and a tenancy in common with other co-owners in the common elements." *Dutcher v. Owens*, 647 S.W.2d 948, 949 (Tex. 1983). According to the Council, Dominy's testimony accounted only for the former, ignoring the latter, and his methodology was thus unreliable for purposes of calculating the fair market value of each plaintiff's ownership interest.

The Council argues that Dominy's opinion therefore should have accounted for both the value of the now-demolished buildings and the value of the land in order to be reliable evidence of market value of the plaintiffs' ownership interests. Dominy defined "market value" as "the price that a willing buyer would pay a willing seller, assuming neither party were under duress." But a condominium owner may not sell a unit without also conveying that ownership share of the property owned in common with the other condominium owners. *Id.*

In the critical portion of Dominy's testimony, he was asked, given that plaintiff "Genzer's unit had been demolished . . . what value does Mr. Genzer's

unit have?" He answered, "Zero." Immediately after Dominy gave this answer, the

Council's attorney conducted the following cross-examination:

> Q.    It has a zero value, are you aware that there's property that's he
>       got an interest that he can recover? I mean, he's still got the
>       property value, did you not take that into consideration when
>       you did this?
>
> A.    He asked me what *that unit* was worth, and *that unit* is worth
>       zero.
>
> Q.    What Mr. Genzer is entitled to as *a unit owner* is a percent of
>       the total, correct, in this case, the total of the property?
>
> A.    I agree with that.
>
> Q.    So, in fact, what the value that Mr. Genzer, as an example, and
>       all the plaintiffs have in that property, they would still have a
>       percent of the value that the property is worth?
>
> A.    *They have a residual interest, they don't have the value of their*
>       *unit as they had it before.*

(Emphasis supplied.)

Contrary to the Council's characterization, Dominy's testimony that the

value of Genzer's "unit" is zero did not ignore the value of plaintiffs' interests in

the land. Rather, Dominy explicitly acknowledged that the plaintiffs still have "a

residual interest" in common elements of the property. Throughout the

questioning, Dominy used "unit" in a manner that referred specifically to certain

improvements on the land (*i.e.*, the particular condominium "units"), separate and

apart from a plaintiff's joint ownership interest in the commonly-owned land and

improvements. The jury could have understood Dominy's testimony as addressing

the pre-casualty and post-demolition values of plaintiffs' individual ownership interests in the improvements. No party contended that The Landing's actions damaged the land; only the portion of market value attributable to the improvements was in dispute.

The calculations Dominy made were supported by testimony about his methodology, his experience appraising real estate, comparable buildings in the area, and various other facts that he identified as bases for his opinions. They did not consist only of subjective beliefs or unsupported speculation. On the contrary, while Dominy testified as to his methodology in detail, the Council did not attempt to demonstrate that his methods were unreliable under the *Robinson* factors. Instead, it simply argues on appeal that Dominy's testimony can be understood only as assigning no value to the land or as having included the land in the appraisal of pre-casualty value, but not in his determination of post-casualty value. According to the Council, either understanding would be incompatible with the evidence at trial that the land has a positive value, rendering Dominy's testimony unreliable. We disagree that these are the only reasonable interpretations of Dominy's testimony regarding the value of Genzer's "unit."

We hold that Dominy's testimony regarding the valuation of the plaintiffs' "units" was sufficiently reliable to support the jury's verdict regarding the

plaintiffs' damages. *See Cooper Tire*, 204 S.W.3d at 800; *Robinson*, 923 S.W.2d at 557.

**B.     Plaintiff Genzer's unit**

The Council next argues that Dominy made and admitted to a calculation error in determining the value of the unit belonging to plaintiff Frank Genzer, Jr., and that this error requires a new trial. Dominy performed two appraisals of units at the Landing. In the first appraisal, he calculated the valuations of the units twice, using two effective dates in December 2010, just before and just after the fire. In that appraisal, he stated the size of Genzer's unit as 981 square feet. In the second appraisal, he calculated the values with an effective date in September 2012 and stated the size of Genzer's unit as 1,887 square feet.

According to the Council, Dominy's first appraisal is evidence of the correct size of Genzer's unit. The jury, however, awarded damages in the amount that Dominy calculated in the second appraisal, using the larger size. Specifically, Dominy calculated $70 as the value per square foot of Genzer's unit. Multiplying by 1,887 square feet and adding a $20,000 premium for Genzer's boat slip, he arrived at a total value for Genzer's unit of $152,090, and the jury awarded damages in this amount. According to the Council, Dominy should have used 981 square feet in his calculations, resulting in a value of no more than $88,670.

The Council argues that Dominy admitted that he used the wrong square footage. Specifically, it points to the following testimony:

Q. Okay. We compare that 83,765 in December of 2010 to the September 2012 number of 152,000, correct?

A. Well, the difference is the unit size. Those would be in "C-1-C" unit.

Q. You have identified it as a "B" unit, but you're saying it should be "C-1-C?"

A. Let me see here just a second. Well, it is supposed to be [a] 1,887 square-foot unit, and for some reason on this other chart, it shows up as a 987 square-foot unit.

Q. So the calculations are wrong in one of the exhibits?

A. Well, probably just the designation of a number was wrong in the first report.

According to the Council, Dominy thus admitted that he made a calculation error by using the 1,887 square-foot size. Dominy's testimony clearly stated the opposite: the 1,887 square-foot size was correct, and the earlier report incorrectly used a smaller size. No other testimony addresses the size of Genzer's unit.

The Council also points to the declaration establishing The Landing, which states the size of unit 144, Genzer's unit, as 981 square feet. According to the Council, this conclusively demonstrates that Dominy's assumptions regarding the facts were incorrect, rendering his testimony legally insufficient to support the judgment. We disagree that the square-footage number in this document, a number about which the record contains no testimony, conclusively established the size of

the unit as 981 square feet, much less that Dominy's valuation of Genzer's unit was necessarily unreliable or incorrect.

"It is the province of the jury to resolve conflicts in the evidence." *City of Keller*, 168 S.W.3d at 820. "Accordingly, courts reviewing all the evidence in a light favorable to the verdict must assume that jurors resolved all conflicts in accordance with that verdict." *Id.* Here, the jury was entitled to accept Dominy's testimony regarding which report was in error and regarding the size of Genzer's unit. Accordingly, we reject the Council's argument that the purported error in valuation of one unit requires a new trial.

## C.    Double recovery

The Council also argues that the trial court's judgment permits a double recovery, allowing the co-owner plaintiffs to profit from a casualty by recovering both insurance proceeds and damages for their claims against the Council. For example, Mary Lou Durham, though not herself a plaintiff at trial, testified that she intended to collect both insurance proceeds and damages from the Council. And as the Council correctly observes, undisputed testimony established that various plaintiffs received insurance payments for the damages suffered during the hurricane and fire. But as Appellants point out in response, the Council did not plead offset as an affirmative defense, nor did it obtain any jury findings on the amounts of the plaintiffs' insurance payments.

A party who argues that a judgment should be discounted by insurance proceeds or that a damages award is unrecoverable in whole or part due to payment of such proceeds is asserting the defense of offset. *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980). "The right of offset is an affirmative defense." *Id.* "The burden of pleading offset and of proving facts necessary to support it are on the party making the assertion." *Id.* (citing *Sw. Bell Tel. Co. v. Gravitt*, 551 S.W.2d 421 (Tex. Civ. App.—San Antonio 1977, writ ref'd n.r.e.)); *see also* TEX. R. CIV. P. 94. But the Council did not plead offset as a defense, nor did it object to the jury questions regarding damages or request alternative questions. The argument is therefore waived. *See* TEX. R. CIV. P. 272, 274; *Brown*, 601 S.W.2d at 936.

## IV.    Plaintiffs' appeal: Prejudgment Interest

In their second issue, Appellants argue that the trial court erred by calculating prejudgment interest using a "trigger date" of November 20, 2012. They argue that the correct date is 180 days from September 26, 2008, when Appellants first gave written notice of their claim, or, alternatively, September 10, 2010, when they filed suit.

Prejudgment interest is governed by Section 304.104 of the Texas Finance Code, which provides, "Except as provided by Section 304.105 or 304.108, prejudgment interest accrues on the amount of a judgment during the period

beginning on the earlier of the 180th day after the date the defendant receives written notice of a claim or the date the suit is filed and ending on the day preceding the date judgment is rendered." TEX. FIN. CODE § 304.104. "A 'claim' is 'a demand for compensation or an assertion of a right to be paid.'" *Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 531 (Tex. 1998) (quoting *Robinson v. Brice*, 894 S.W.2d 525, 528 (Tex. App.—Austin 1995, writ denied)). A defendant has notice of a claim for purposes of prejudgment interest only if the plaintiff's written notice communicates that the plaintiff is claiming a right to compensation and provides enough information that the defendant could plausibly settle the claim without incurring interest. *Id.*; *see also Owens–Ill., Inc. v. Estate of Burt*, 897 S.W.2d 765, 769 (Tex. 1995).

Appellants first argue that they gave written notice of their claim on September 26, 2008, and that prejudgment interest should therefore run from 180 days after that date. The purported notice in question is an email from Mary Lou Durham (an officer of condominium owner and plaintiff Bull Capital) to Andrew Rosenberg (who became a Council Board Administrator in 2009, but was not an Administrator in 2008). In a series of emails, Durham explained that she was dissatisfied with the Board's handling of the damages inflicted by Hurricane Ike two weeks earlier and described meeting with an attorney. Rosenberg discussed the attorney in question and opined, in an email on September 27, that

29

Rick Butler, the Council's attorney, had violated The Landing's bylaws. The document did not make a demand that anyone pay money to anyone else, nor did it specify any amounts by which anyone had been damaged or any reasons why such a payment should be made.

Durham was not a plaintiff at the time of trial or when judgment was rendered. Although she initially participated in the suit in her role as an officer of Bull Capital, she ceased to be a party before trial. Moreover, Rosenberg was not on the Board at the time of the email in question.

We also note with respect to this document that Durham testified she was not contemplating a lawsuit when she wrote the email. Appellants argue that Board President Jenkins nonetheless interpreted the email as a threat of a lawsuit. But Jenkins testified only that Durham was "threatening lawsuits" at the time the Board decided not to proceed with the improperly called Article 12 vote in the fall of 2008. He explained that the threats were "[o]ver calling an Article 12 meeting." He made no mention of any demand for payment of a claim. Appellants also rely on statements during argument by the defendants' counsel that plaintiffs gave notice of their intent to sue within two weeks of the storm. The arguments of counsel are not evidence, and mere notice of the intent to sue is not legally sufficient to establish a written claim for these purposes because a demand of compensation must be included. *See Johnson & Higgins*, 962 S.W.2d at 531.

30

We hold that the September 26, 2008 email from Mary Lou Durham, a non-plaintiff, to Andrew Rosenberg, who was not then a member of the Board and thus not liable for any actions taken by the Board during the relevant time period, did not constitute a claim for purposes of triggering the accrual of prejudgment interest. *See* TEX. FIN. CODE § 304.104; *see also Lee v. Fenwick*, 907 S.W.2d 88, 89–90 (Tex. App.—Eastland 1995, writ denied) (actual receipt of written notice by potential defendant is statutory requirement).

Alternatively, Appellants argue that prejudgment interest should run from the date when they filed suit in 2010. But prejudgment interest does not always run from the date on which a plaintiff files suit. Rather, the relevant date is that on which the plaintiff asserted the claim which ultimately results in a recovery. *See, e.g.*, *I-10 Colony, Inc. v. Lee*, 393 S.W.3d 467, 480 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *Tex Star Motors, Inc. v. Regal Fin. Co.*, 401 S.W.3d 190, 203–04 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 487–87 (Tex. App.—Fort Worth 2004, no pet.).

For example, in *Tex Star Motors, Inc. v. Regal Finance Co.*, 401 S.W.3d 190 (Tex. App.—Houston [14th Dist.] 2012, no pet.), the plaintiff first asserted the claims on which it later recovered, in an amended petition. *Tex Star Motors*, 401 S.W.3d at 204. The defendant had no notice of those claims until the filing of the

31

amended petition. *Id.* The court of appeals held that the plaintiff could recover prejudgment interest only from the date of the amended petition. *Id.*; *see also I-10 Colony*, 393 S.W.3d at 480.

In this case, the plaintiffs initially asserted only one claim: that the Council and the Board were negligent in failing to prepare for and respond to Hurricane Ike. They asserted five theories of liability: (1) failure to ensure that vessels were removed from the marina or properly secured before the storm; (2) failure to repair structures after the storm; (3) failure to appeal Smith's substantial-damage determination; (4) waste of assets after the storm that could have been used for repairs; and (5) "other acts and omissions." They eventually elected to recover their damages based solely on the Council's breaches of two contracts: the bylaws and declarations. But the original petition did not contain a breach-of-contract claim. Rather, the plaintiffs asserted their breach-of-contract claim in their seventh amended petition, filed November 20, 2012.

Moreover, the sole measure of damages submitted to the jury was the fair market value of each of the plaintiff's condominiums as if they had been repaired to pre-hurricane condition. This measure of damages was only relevant in the event that a property was found to be totally destroyed or damaged beyond repair; it would not have been proper for any damage to the property that could be repaired. When repairs are economically feasible, the proper measure of damages is the cost

32

of repair; the diminution in market value of the property is the correct measure only when it is less than the cost of repairs. *See N. Ridge Corp. v. Walraven*, 957 S.W.2d 116, 119 (Tex. App.—Eastland 1997, pet. denied); *B.A. Mortg. Co., Inc. v. McCullough*, 590 S.W.2d 955, 957 (Tex. Civ. App.—Fort Worth 1979, no writ). The total destruction of The Landing occurred at its demolition in April 2011, after the plaintiffs filed their original petition. That petition could not have served as notice of a claim that had not yet accrued.

Because neither the September 26, 2008 email nor the plaintiffs' original petition put the defendants on notice of the claim upon which the plaintiffs ultimately recovered, prejudgment interest did not begin to accrue until the plaintiffs asserted their breach of contract claim. We hold that the trial court did not err in calculating prejudgment interest from November 20, 2012.

## V.     Wheelbarger's claims for declaratory judgment and attorney's fees

In her final issue, Wheelbarger argues that the trial court erred by denying her claims for declaratory relief and attorney's fees.[7]

---

[7]     Appellees again argue that Wheelbarger has waived this issue by failing to include her live pleading in the appellate record. For the same reasons that we declined to hold that Wheelbarger waived her challenge to the directed verdict, *see supra* note 4, we decline to hold that she waived her final issue.

## A. Declaratory relief

The judgment denied the requested declaratory relief on two bases. First, the trial court found "that the Declarations requested would affect the rights of all condominium owners and therefore all condominium owners [are] necessary parties to this litigation [but] not all condominium owners are parties to this litigation." Second, it found that Wheelbarger's pleadings did not support all of the requested declarations. Wheelbarger challenges both of these reasons, arguing that (1) her pleadings support the requested declarations, (2) she obtained jury findings sufficient to support the declarations, (3) joinder of the other co-owners of The Landing was not required, and (4) she is entitled to attorney's fees because the jury found that she was "adversely affected" by the Council's actions.

Declaratory judgments are authorized by Section 37.003 of the Civil Practice and Remedies Code, which provides, "A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed." TEX. CIV. PRAC. & REM. CODE § 37.003(a). A trial court's decision to enter or refuse a declaratory judgment therefore rests within the sound discretion of the trial court. *See*, *e.g.*, *Space Master Int'l, Inc. v. Porta-Kamp Mfg. Co., Inc.*, 794 S.W.2d 944, 947 (Tex. App.—Houston [1st Dist.] 1990, no pet.).

34

"It is . . . within the discretion of the trial court to refuse to enter a declaratory judgment or decree if the judgment or decree would not terminate the uncertainty or controversy giving rise to the proceeding." *Id.*; *see also SpawGlass Constr. Corp. v. City of Houston*, 974 S.W.2d 876, 878 (Tex. App.—Houston [14th Dist.] 1998, pet. denied); *Scurlock Permian Corp. v. Brazos Cnty.*, 869 S.W.2d 478, 486 (Tex. App.—Houston [1st Dist.] 1993, writ denied). "The Declaratory Judgments Act was never intended to provide for the piecemeal litigation of lawsuits." *Space Master Int'l*, 794 S.W.2d at 947 (citing *United Serv. Life Ins. Co. v. Delaney*, 396 S.W.2d 855, 858 (Tex. 1965)).

Wheelbarger first argues that her live pleading requests findings that track the language of the declarations that she ultimately sought. Her live pleading requested four declarations relating to her claims against the Council and the Board members:

1.  That a vote of the members of the Association to demolish The Landing was required before the Board of Administrators of the Association would have been permitted to seek a permit for and proceed with the demolition of the Landing Condominium Complex;

2.  In order for the Association's Board of Administrators to have proceeded to seek a permit for demolition of The Landing Condominium Complex (and then actual demolition), a vote of no less than 75% of the members of the Association would have been required to approve such demolition;

3.  The appeal requested by members of the Supporting Owners regarding the City's "substantial damage" determination must

35

be completed prior to a vote of the members of the Association on demolition and termination of the condominium regime; and

4.   The Texas Property Code required The Landing Condominium Complex to be rebuilt or repaired unless the exceptions and required vote set forth in either 81.206 or 82.111(i) of the Texas Property Code were satisfied.

By contrast, in her proposed judgment Wheelbarger sought the following declarations:

1.   Following Hurricane Ike in September 2008, The Landing Council of Co-Owners had a mandatory duty under Texas law to repair and rebuild all portions of The Landing Condominium Complex damaged by Hurricane Ike;

2.   The Landing Council of Co-Owners failed to timely call and hold a Special Meeting of Co-Owners under Article XII of the Declarations following Hurricane Ike;

3.   The legal consequence of failing to timely call and hold a Special Meeting of Co-Owners under Article XII of the Declarations following Hurricane Ike is that the Landing Council of Co-Owners' duty to repair and rebuild the portions of The Landing Condominium Complex that was damaged by Hurricane Ike is unabated and still remains;

4.   Following the fire in December 2010, The Landing Council of Co-Owners had a mandatory duty under Texas law to repair and rebuild all portions of The Landing Condominium Complex that was damaged by such fire;

5.   At a Special Meeting of Co-Owners under Article XII of the Declaration held less than forty (40) days after such fire, less than sixty-seven percent (67%) of the Co-Owners of The Common Elements voted in favor of finding that more than two-thirds of The Landing Condominium Complex required reconstruction because of the fire or other casualty;

6. The legal consequence of obtaining less than 67% of the vote of the Co-Owners of The Common Elements in The Landing is that the Landing Council of Co-Owners' duty to repair and rebuild the portions of The Landing Condominium Complex that was damaged by such fire is unabated and still remains;

7. All insurance proceeds paid to the Landing Council of Co-Owners as a result of either Hurricane Ike or the fire, less the expenses of the Trustee, are required to be used to repair and rebuild the portions of The Landing Condominium Complex damaged by Hurricane Ike or the fire, as applicable;

8. The condominium regime of the Landing Condominium Complex has not been and may not be terminated pursuant to Article XII or Article XIII of the Declarations as a result of Hurricane Ike or the fire in December 2010; and

9. The Board of Administrators of The Landing Council of Co-Owners does not have any authority to market or sell any portion of the Common Elements, including, but not limited to, the land.

There is no clear relationship between any of the declarations that Wheelbarger sought in her motion for entry of judgment and the claims for declaratory relief on which she proceeded to trial. On the contrary, the relief that Wheelbarger sought after trial is both significantly different and significantly greater than that requested in her pleadings. A trial court commits reversible error if it grants relief beyond that requested in the parties' pleadings. *Binder v. Joe*, 193 S.W.3d 29, 33 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

Moreover, the factual findings that Wheelbarger obtained from the jury do not support her requested declarations. The jury made only three findings of relevance to this issue. First, it found that the Council failed to obtain the consent

37

of all co-owners and their first-lien mortgagees before obtaining a demolition permit and demolishing The Landing. Second, it found that the Council prevented the "Concerned Owners of The Landing Condominiums" from proceeding with their attempted appeal of the substantial-damage determination. Third, it found that at the Article 12 meeting in January 2011, fewer than 67% of the co-owners of The Landing's common elements voted to find that more than two-thirds of The Landing required reconstruction because of the fire or other casualty. These findings do not support any of the declarations requested by Wheelbarger in either her live pleading or motion for entry of judgment.

Because the requested declarations are not supported by Wheelbarger's pleadings or by the questions submitted to the jury, we hold that the trial court did not abuse its discretion in denying declaratory relief.

## B.    Attorney's fees

Wheelbarger also contends that the trial court should have awarded her attorney's fees because the jury found that she was "adversely affected" by the Council's failure to comply with the bylaws, declarations, and Property Code. She relies on Section 82.161 of the Texas Property Code, which provides:

> (a) If a declarant or any other person subject to this chapter violates this chapter, the declaration, or the bylaws, any person or class of persons adversely affected by the violation has a claim for appropriate relief.

> (b) The prevailing party in an action to enforce the declaration, bylaws, or rules is entitled to reasonable attorney's fees and costs of litigation from the nonprevailing party.

TEX. PROP. CODE § 82.161. The jury found that the Council violated Section 82.111(i) of the Property Code, The Landing's bylaws, and the declarations, and that these violations "adversely affected" Wheelbarger. According to Wheelbarger, she is therefore entitled to recover her attorney's fees. Under the statute, however, she can do so only if she is a "prevailing party."

It is well-settled under Texas law that "to prevail, a claimant must obtain actual and meaningful relief, something that materially alters the parties' legal relationship." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 652 (Tex. 2009); *see also Farrar v. Hobby*, 506 U.S. 103, 109–10, 113 S. Ct. 566, 572 (1992). This rule applies in the context of Section 82.161: to qualify as a "prevailing party," Wheelbarger must show not only that she was "adversely affected" but also that she suffered damages or otherwise obtained affirmative relief from the trial court. *See Buttross V., Inc. v. Victoria Square Condo. Homeowners' Ass'n, Inc.*, No. 03-09-00526-CV, 2010 WL 3271957, at *3–4 (Tex. App.—Austin Aug. 18, 2010, pet. denied) (mem. op.). She obtained no relief from the trial court, however, and therefore she is not a prevailing party within the meaning of Section 82.161.

Because Wheelbarger has not demonstrated that the trial court erred in denying her declaratory relief or attorney's fees, we overrule her third issue.

## VI. Council's cross-appeal: Attorney's fees

In the Council's final issue, it argues that we should modify the trial court's judgment to exclude attorney's fees. It contends that the jury's findings regarding violations of the Property Code cannot sustain the fees award. It further argues that the trial court erred by refusing to submit a question on excuse due to impossibility as an affirmative defense to the plaintiffs' breach-of-contract claims, and therefore the breach-of-contract findings also cannot sustain the fees award. Specifically, it argues that it was entitled to a question regarding whether performance under the bylaws and declaration was impossible, excusing the Council's breaches of those agreements.

A prevailing party is entitled to recover attorney's fees incurred in pursuing a claim for breach of contract. TEX. CIV. PRAC. & REM. CODE § 38.001(8). Here, the plaintiffs recovered damages for breach of the bylaws and declaration and elected those damages as their remedy. The Council argues that the omission of a question regarding the affirmative defense of excuse renders the judgment unsupportable and, along with it, the recovery of attorney's fees.

At the charge conference, the Council requested the inclusion of the question: "Was Defendants' failure to comply [with the bylaws or declaration]

40

excused?" They requested as the accompanying proposed instruction: "Failure to comply by the Landing is excused by Plaintiffs' previous failure to comply with a material obligation of the same agreement." They also asked the trial court to add an instruction to the breach-of-contract liability questions that the Council's failure to comply was excused if the plaintiffs waived performance. None of the requested questions or instructions relates to impossibility of performance. The trial court refused the requested question and instructions. *See* TEX. R. CIV. P. 276.

By contrast, on appeal, the Council argues that the trial court should have submitted a question on excuse due to impossibility. It argues that a third party's failure to mail notices of the Article 12 meeting, combined with delays in mail delivery and the dispersion of The Landing's residents after the hurricane, made it impossible to hold that meeting in a timely manner. It also argues that changes in the City of El Lago's building codes made it impossible for the Council to repair the property to the pre-storm condition or to use insurance proceeds for that purpose.

A party is obligated to present its objections to the charge "before the charge is read to the jury." TEX. R. CIV. P. 272. The objection must be specific; "[a] party objecting to a charge must point out distinctly the objectionable matter and the grounds of the objection." TEX. R. CIV. P. 274; *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43 (Tex. 2007). Moreover, the party's objection must have "stated the

41

grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." TEX. R. APP. P. 33.1(a). A party must "clearly designate the alleged error and specifically explain the basis of its complaint in its objection to the charge." *Hamid v. Lexus*, 369 S.W.3d 291, 296 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (quoting *Carousel's Creamery, L.L.C. v. Marble Slab Creamery, Inc.*, 134 S.W.3d 385, 404–05 (Tex. App.—Houston [1st Dist.] 2004, pet. dism'd)).

Failure to object timely to error in a jury charge constitutes a waiver of that error. TEX. R. CIV. P. 272. "Any complaint as to a question, definition, or instruction, on account of any defect, omission, or fault in pleading, is waived unless specifically included in the objections." TEX. R. CIV. P. 274. A party also waives an objection when it is "obscured or concealed by voluminous unfounded objections, minute differentiations or numerous unnecessary requests." *Id*.; *Dallas Cnty. v. Crestview Corners Car Wash*, 370 S.W.3d 25, 53 (Tex. App.—Dallas 2012, pet. denied). "Failure to submit a question shall not be deemed a ground for reversal of the judgment, unless its submission, in substantially correct wording, has been requested in writing and tendered by the party complaining of the judgment; provided, however, that objection to such failure shall suffice in such respect if the question is one relied upon by the opposing party." TEX. R. CIV.

P. 278. "Failure to submit a definition or instruction shall not be deemed a ground for reversal of the judgment unless a substantially correct definition or instruction has been requested in writing and tendered by the party complaining of the judgment." *Id.* "Upon appeal all independent grounds of recovery or defense not conclusively established under the evidence and no element of which is submitted or requested are waived." TEX. R. CIV. P. 279.

The Council's arguments on appeal do not comport with its requested question and instructions at trial. Moreover, it identifies no evidence in the record, and we have not found any, supporting the questions and instructions that it actually requested regarding excuse due to prior material breach or excuse by waiver of compliance. Because the Council failed to present a question or instruction regarding excuse due to impossibility, it waived the right to complain on appeal that the charge omitted such questions or instructions. TEX. R. CIV. P. 278, 279; *see also* TEX. R. CIV. P. 272, 274. And because it has not shown that the questions and instructions that it did request on the defense of excuse were supported by the evidence, it has not shown that the trial court erred in refusing the requests. *E.g.*, TEX. R. CIV. P. 278 (questions and instructions must be supported by the evidence); *see also* TEX. R. CIV. P. 272 (parties must object); TEX. R. CIV. P. 274 (objection must be specific).

We hold that the trial court did not err by refusing to submit the Council's requested question and instructions on excuse, and the jury's findings that the Council breached the bylaws and declaration support the award of attorney's fees. TEX. CIV. PRAC. & REM. CODE § 38.001(8). We therefore overrule the Council's third issue.

## Conclusion

Having overruled all of the parties' issues on appeal, we affirm the judgment of the trial court.


                                                Michael Massengale
                                                Justice

Panel consists of Justices Jennings, Massengale, and Lloyd.